**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHWESTERN DIVISION**

| | | |
|---|---|---|
| Sharon Champagne, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:06-cv-024 |
| | ) | |
| Secretary of the Department of the | ) | **ORDER GRANTING DEFENDANT'S** |
| Interior, Gale Norton, | ) | **MOTION FOR SUMMARY JUDGMENT** |
| | ) | |
| Defendant. | ) | |

The plaintiff, Sharon Champagne ("Champagne"), commenced this action on March 23, 2006, against the Secretary of the Department of the Interior, Gail Norton ("Government") alleging gender discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 *et seq*. Champagne claims she was subjected to a sexually hostile work environment by a coworker.

Before the Court is the Defendant's motion for summary judgment. Unless otherwise indicated, the facts set forth below have been construed most favorably for Champagne.

**I.    BACKGROUND**

  **A.    The Parties**

Champagne was hired by the United States Department of Interior, Bureau of Indian Affairs ("BIA"), Bureau of Indian Education ("BIE"), in August of 1985 to teach at the Turtle Mountain Elementary School on the Turtle Mountain Indian Reservation. In her twenty-one years of employment with the BIE, she has spent nineteen years as a kindergarten teacher. She also spent one year teaching first grade and one year teaching fourth grade.

Steven Davis is also a teacher at the Turtle Mountain Elementary School. He was hired by the BIE in 1980. Champagne alleges Davis sexually harassed her. Davis and Champagne were both

teaching kindergarten in adjoining classrooms when the incident which lead to this lawsuit occurred. Patty Gourneau is an assistant principal at the Turtle Mountain Elementary School. She is employed by the State of North Dakota, Belcourt School District No. 7. She is not a BIE employee.

David Gourneau is the Principal at the Turtle Mountain Elementary School. He was appointed Acting Principal on October 16, 2004, and his appointment became permanent on July 23, 2005. He is a BIE employee. Patty Gourneau and David Gourneau are not related. Patty Gourneau reports to David Gourneau despite their having different employers.

### B. Alleged Incidents

#### 1. The "gift" and subsequent events

Around Thanksgiving of 2004, the staff at the Turtle Mountain Elementary School drew names for a Christmas gift exchange. Davis did not draw Champagne's name. On Friday, December 17, 2004, Davis left a gift-wrapped present on Champagne's desk. This was the last day of school before the scheduled Christmas break. Champagne was leery given past comments and conduct by Davis and did not open it immediately. Sometime later that day Davis asked her if she had opened the gift and when Champagne stated she had not, Davis advised her not to open it in front of her class. At some point another teacher, Cindy Olson ("Olson"), came into Champagne's room and inquired about the gift. Olson opened the gift. Gary Laducer was also present. The gift was a pair of black lace crotchless panties. Champagne took the gift to Davis's room and confronted him asking him how he could do that to her. He said "thank you, thank you" and laughed. He considered the gift a joke. Champagne became very upset and began crying. She was unable to regain her composure and went with Olson to see Assistant Principal Patty Gourneau. Champagne

dictated a statement to Patty Gourneau. The statement referenced a number of previous incidents, as well as the "gift."

Patty Gourneau took immediate action. She communicated Champagne's reaction to Davis the same day and directed that he stay away from Champagne for the rest of the day. She also reported the incident to Principal David Gourneau.

David Gourneau did not find time to meet with Champagne on the 17th but did speak to her about it when he saw Champagne the next day, December 18, 2004, at Wal-Mart. He apologized to Champagne for not speaking to her on the 17th. He told Champagne he would speak to Davis about the incident. On December 20, 2004, he telephoned Davis and told him to prepare a written summary of the incident and Davis agreed to do so. Davis also agreed to write a letter of apology.

Champagne and David Gourneau spoke about the incident again on Tuesday, December 21, 2004, when Champagne was in the school to take down Christmas decorations. Champagne explained what had happened on the 17th and David Gourneau agreed the gift was inappropriate. He apologized a second time for not meeting with her on the 17th and advised Champagne he would speak with Davis. The statement and a copy of the letter of apology were delivered by Davis to David Gourneau on December 22, 2004.

After receiving Davis's statement, David Gourneau submitted Champagne's complaints and Davis's statement to BIE human resources personnel in Albuquerque, New Mexico. David Gourneau reviewed the matter with BIE human resources personnel and imposed the remedy they suggested for a first-time sexual harassment complaint against an employee under similar circumstances. Specifically, David Gourneau prepared a letter of reprimand to Davis dated December 23, 2004, stating that the gift Davis gave Champagne was inappropriate and that it upset

Champagne. The letter also advised Davis that he would be subject to further disciplinary action if he did not refrain from similar inappropriate behavior. The letter of reprimand was given to Davis January 3, 2005.

Davis delivered his letter of apology to Champagne on January 3, 2005, which would have been the first day back at school after the Christmas break. The letter was delivered along with a willow basket that Davis characterized as a peace offering. Champagne refused the gift and told Davis to leave her classroom.

On January 3, 2005, David Gourneau met with Champagne for a second time to discuss the incident. He advised Champagne she could submit her concerns to the Equal Opportunity Employment personnel with the BIE. David Gourneau also made arrangements for a door to be installed between Davis's classroom and Champagne's classroom in order to minimize contact between the two teachers. There was still a small common area between their rooms which employees used. Champagne testified that after the door had been installed, Davis would come into this middle common area and stare at her.

Champagne contacted an EEO counselor on January 4, 2005, and filed a formal complaint on February 21, 2005. An EEO investigator was assigned to the case by the BIA. Interviews were conducted with Champagne, Patty Gourneau and David Gourneau in August 2005. Champagne was not told specifically what disciplinary action had been taken against Davis, although she would have been aware of the new door that was installed, the written apology, and the fact he had been talked to.

Complications from Davis's diabetes caused him to be absent from school from the President's Day holiday in February 2004 through the end of the school year. Davis has not spoken to Champagne since December 2004, other than to say "hi" on one occasion at school.

The next year Davis was assigned to teach the second grade. The second grade classrooms are located some distance from the kindergarten classrooms. The Government characterizes this move as a reassignment in order to minimize contact between Champagne and Davis, but the reason for the reassignment is disputed by Champagne. At his deposition Davis testified that he was asked if he wanted to move to second grade, that he readily agreed, and that the move was not a forced reassignment or any form of disciplinary action. Davis continues to teach second grade.

**2.     Additional background**

When the incidents giving rise to this action occurred, the Turtle Mountain Elementary School had a policy prohibiting sexual harassment and discrimination. The policy was contained in the Turtle Mountain Community Elementary School Staff Handbook. Each employee received a copy of the handbook. And, for at least several years prior to the events in this case, the handbook was reviewed with the staff on a yearly basis at an orientation meeting that occurred at the beginning of the school year and that would last several hours. Davis stated he was aware of the policy in a general sense, but was not aware of the specifics of the policy and that very little time was devoted to it during the orientation.

Davis and Champagne had worked together as kindergarten teachers for a number of years prior to December 2004. Champagne acknowledged that, for much of this time, she looked upon Davis as being a mentor and a good resource person. Also, Champagne acknowledged that their relationship was more than just professional and that there was a degree of personal friendship. She

5

acknowledged that, at times, she had shared personal stories and problems with Davis and had occasionally borrowed money from him. In fact, just two or there months before Davis gave the tasteless gift, she had borrowed $1,800 from him.

Davis was also involved in a later incident of alleged sexual harassment in June 2006, but the incident did not involve Champagne. Davis was suspended without pay for fourteen days for this incident. Davis has not been provided any specialized training or education regarding sexual harassment or the district's policy prohibiting it.

Before 2004, Davis had not received any formal complaints about his work or his professionalism. His performance reviews had all been good. He was generally viewed as being a good teacher.      Davis stated he has a good working relationship with David Gourneau. The two have known each other since childhood and over the years have been social acquaintances.

### 3.     Other objectionable conduct

Champagne alleges a number of other incidents of inappropriate conduct on the part of Davis. She claims that some of the conduct had been going on for some time and prior to the fall of 2004. She claims that other incidents took place in the late fall and holiday season of 2004 shortly before the "gift" of the panties.

Champagne did not report any of the other alleged conduct when it occurred, but is adamant she reported some of it to Patty Gourneau sometime after Thanksgiving 2004 and prior to December 17, 2004. She acknowledges she made no report to David Gourneau prior to December 17, 2004.

Patty Gourneau disputes Champagne's recollection of when Champagne reported other incidents involving Davis to her. Gourneau stated in her affidavit that she did not learn of other alleged incidents until December 17, 2004. She stated that Champagne had earlier complained about

Davis excessively visiting her room, but that her complaint did not involve any allegations of sexual comments, jokes, or touching. For purposes of the present motion, Champagne's version of the sequence of events will be accepted.

Some of the other objectionable conduct claimed by Champagne was referenced in her written statement that she made on December 17, 2004. Despite some of the other conduct being referenced in the statement, David Gourneau claims he only became aware of the other claimed conduct in January of 2007, shortly before his deposition in this case.

In his deposition testimony, Davis acknowledged some of the other conduct and incidents and characterized them, essentially, as either joking on his part, or, in some cases, arising out sexual banter among co-workers. Again, for purposes of summary judgment, Champagne's characterization of the other incidents will be accepted.

The following summarizes the additional objectionable conduct claimed by Champagne:

- <u>Gender-related jokes</u>. On one occasion Davis came up to Champagne and her adult daughter, Jackie, while they were at the school. Davis asked Champagne's daughter what she was doing that weekend because he was taking a trip up to Canada and he wanted to invite her. Davis indicated that he had some friends up there at the "Pen" who he was going to see. Davis suggested to Champagne's daughter that there were "cute little cottages" up there and his friends could have "conjugal visits." Champagne told Davis that he should not talk to her children that way. Davis responded he was "only teasing." Champagne claims she made clear to Davis that she did not think it was teasing. Champagne states this incident occurred prior to the summer of 2004.

Another example of gender-related joking claimed by Champagne is that Davis entered a common area at the school saying, "ho, ho, ho" and then "oh, who looked?" The joke was meant to refer to a whore or prostitute with the implication that anyone who looked was one. He did this on more than one occasion between Thanksgiving and Christmas 2004.

Still another example was that, around Thanksgiving of 2004, employees of the school picked names of coworkers in order to exchange Christmas presents. Davis picked the name of Angel Dubois. Davis asked Champagne whether she thought he should buy Dubois a thong. The list of employees' names was posted in the common area between the kindergarten rooms so that the recipient could write possible gift ideas down for whomever picked their name. Davis wrote down "thong" behind Angel's name trying to make it look as if she were asking someone to purchase a thong for her. Davis then told Champagne what he had done. The list of names with the reference to the thong was out in the open for all employees to see.

- <u>Discussions about women's lingerie</u>. In one incident, Davis looked at an Avon book and talked about the women's lingerie to Champagne. Also, there were other occasions when Davis talked about women's underwear or lingerie with Champagne and asked her what she thought of different items in newspaper advertisements. These types of remarks started before the summer of 2004 and were made to other female employees as well.

- <u>Minor touching and invasion of personal space</u>. On one occasion, Davis walked by Champagne and tried to grab her hand and hold onto it. There was an occasion

during an in-service meeting at the school that Davis sat across from Champagne and tried grabbing her hand. Champagne pulled her hand back and asked Davis what he was doing. There was an occasion when Davis allegedly came up behind Champagne, made kissing sounds, and touched her shoulders. On these occasions, Champagne claims she would tell Davis to knock it off, would walk away, and/or advise him that this was not appropriate or that he was "sick." There is no claim of any force being exerted or that Davis persisted on any particular occasion after being told to stop.

- <u>Other gender-related remarks</u>. Champagne claims that, on occasion, Davis would make statements in the presence of others like "Do you love me, Mrs. Champagne?"
- <u>Suggestions to kindergarten students that they give Champagne a kiss</u>. On several occasions, Davis allegedly told kindergarten students to "go give Mrs. Champagne a kiss for me."

## II.   ANALYSIS

### A.   Governing law

The following well-established principles govern the court's consideration of the Defendant's motion for summary judgment:

> Summary judgment is appropriate only when the pleadings, depositions and affidavits submitted by the parties indicate no genuine issue of material fact and show that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The party seeking summary judgment must first identify grounds demonstrating the absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Such a showing shifts to the non-movant the burden to go beyond the pleadings and present affirmative evidence showing that a genuine issue of material fact exists. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256-57, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). The non-moving party "must do more than simply show that there is some

> metaphysical doubt as to the material facts." <u>Matsushita Elec. Ind. Co.</u>, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d (1986). The non-movant "must show there is sufficient evidence to support a jury verdict in [her] favor." <u>Nat'l Bank of Commerce v. Dow Chem. Co.</u>, 165 F.3d 602, 607 (8th Cir.1999). "Factual disputes that are irrelevant or unnecessary will not be counted," <u>Anderson</u>, 477 U.S. at 248, 106 S.Ct. 2505, and a mere scintilla of evidence supporting the nonmovant's position will not fulfill the non-movant's burden, <u>id</u>. at 252, 106 S.Ct. 2505.

<u>Uhiren v. Bristol-Meyers Squibb Company, Inc.</u>, 346 F.3d 824, 827 (8th Cir. 2003).

Champagne claims that the federal government should be held liable because she was subjected to a "hostile work environment" in violation of Title VII. To prevail on a hostile-work-environment claim, Champagne must show that (1) she belongs to a protected group, (2) she was subjected to unwelcome harassment, (3) a causal nexus exists between the harassment and her protected group status, (4) that the harassment affected a term, condition, or privilege of her employment, and (5) that her employer knew or should have known of the harassment and failed to take prompt and effective remedial action. E.g., <u>Tatum v. Arkansas Department of Health</u>, 411 F.3d 955, 959 (8th Cir. 2005); <u>Williams v. ConAgra Poultry Co.</u>, 378 F.3d 790, 794-95 (8th Cir. 2004). The first three elements are not in issue.

### B. Whether Davis's conduct was sufficiently severe or pervasive to give rise to a hostile work environment claim

In making a Title VII claim for sexual discrimination based on a hostile work environment, it is not enough for Champagne to prove that she was sexually harassed. She must also prove that the harassment was so severe or pervasive that it affected a term, condition, or privilege of employment. In <u>Nitsche v. CEO of Osage Valley Elec. Co-op</u>, 446 F.3d 841, 845 -847 (8th Cir. 2006), the court summarized this element and what must be proved as follows:

> "Harassment affects a term, condition, or privilege of employment if it is 'sufficiently severe or pervasive to alter the conditions of the victim's employment

10

and create an abusive working environment.' " *Howard v. Burns Bros., Inc.,* 149 F.3d 835, 840 (8th Cir.1998) (quoting *Harris,* 510 U.S. at 21, 114 S.Ct. 367). [Plaintiff] . . . must clear a high threshold to demonstrate actionable harm, for "complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing" obtain no remedy. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (internal quotation omitted). "[A] sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Id.* at 787, 118 S.Ct. 2275 (citation omitted). To be actionable, the conduct complained of must be extreme in nature and not merely rude or unpleasant. *LeGrand,* 394 F.3d at 1101 (citation omitted). Allegations of a few isolated or sporadic incidents will not suffice; rather, the plaintiff must demonstrate the alleged harassment was "so intimidating, offensive, or hostile that it poisoned the work environment." *Tuggle v. Mangan,* 348 F.3d 714, 720 (8th Cir.2003) (quoting *Scusa v. Nestle U.S.A. Co.,* 181 F.3d 958, 967 (8th Cir.1999)). Such standards are demanding, for "Title VII does not prohibit all verbal or physical harassment" and is not "a general civility code for the American workplace." *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). In determining whether a work environment was sufficiently hostile or abusive, we examine the totality of the circumstances, including whether the discriminatory conduct was frequent and severe; whether it was physically threatening or humiliating, as opposed to merely an offensive utterance; and whether it unreasonably interfered with the employee's work performance. *Harris,* 510 U.S. at 23, 114 S.Ct. 367.

In this case, the court notes, in particular, the following:

- Champagne was able to continue teaching at the Turtle Mountain Elementary School and the acts of harassment did not affect her work performance.

- The sole source of the objectionable and harassing conduct was Davis, who was a co-worker of equal rank and a person Champagne had worked closely with for a number of years without apparent problems.

- By her own admission, Champagne had more than a professional relationship with Davis. The undisputed facts are that she had borrowed more than trivial amounts of money from Davis on several occasions, including an $1,800 amount while the

11

>    alleged objectionable conduct was occurring. She also acknowledged that she had shared aspects of her personal life with Davis on occasion.
>
> •  The lack of evidence that the harassment, including the acts of minor touching, was physically threatening. Also, there is no evidence that the touching or attempted touching continued on any one occasion after an objection was lodged.
>
> •  A number of the gender-related jokes are best described as crude commentary and off-color joking that, while inappropriate and boorish, are the type of tribulation that is common in the workplace.
>
> •  The gift of the crotchless panties, while obviously tasteless, boorish, and the proper subject of discipline, was not extreme harassment.
>
> •  The fact that, while Davis on several occasions made "kissing sounds" or comments such as "do you love me," there is no evidence that he ever propositioned Champagne or suggested that they engage in any sexual acts.

After giving full deference to Champagne's allegations with respect to the "gift" and the other claimed objectionable conduct, the court concludes that Davis's conduct, while sexually harassing and deplorable, is not sufficient to clear the high threshold that governing case law requires to prove a work environment sufficiently hostile that it can be said to have affected a term or condition of employment. In particular, the objectionable conduct in this case is less egregious than what the Eighth Circuit in prior decisions has found to be insufficient as a matter of law. See id.; see also Alagna v. Smithville R-II School District, 324 F.3d 975 (8th Cir. 2003) (a male teacher's conduct toward a female co-worker that involved touching her arm, commenting on her appearance, saying "I love you," exhibiting a demeanor of a sexual nature, calling her repeatedly

at home, and giving her two romance novels and another gift was found not to be actionable); Duncan v. General Motors Corp., 300 F.3d 928 (8th Cir. 2002) (no hostile work environment created by a male co-worker of a higher rank who: propositioned the female plaintiff; touched her on more than one occasion; teased her and criticized her work; displayed a naked woman on a screen-saver; requested that she sketch a planter shaped like a slouched man with a cactus protruding from his pants; and asked her to type a draft of the beliefs of the "He-Men Women Hater's Club").

### C. Whether Champagne's employer knew or should have know about the harassment and failed to take prompt and effective remedial action

In order to prevail on her claim of a hostile work environment, Champagne must also prove that her employer knew or should have known of the harassment and failed to take prompt and effective remedial action. E.g., Tatum v. Arkansas Department of Health, 411 F.3d at 959. Factors to be considered with respect to this element include the amount of time that elapsed between the report of the harassment and the remedial action, the remedial actions taken, disciplinary actions taken, and whether the measures ended the harassment. Meriwether v. Caraustar Packaging Co., 326 F.3d 990, 994 (8th Cir. 2003); Stuart v. General Motors Corp., 217 F.3d 621, 633 (8th Cir. 2000).

In this case, there is no dispute about the following facts:

- On the same day the tasteless gift of the panties was made, which was December 17, 2004, Patty Gourneau talked to Davis, told him to stay away from Champagne for the rest of the day, and reported the matter to principal David Gourneau.

- The Christmas recess began the same day and eliminated any workplace contact between Champagne and Davis until school resumed the first week of January 2005.

- David Gourneau talked to Davis on December 20, 2004, and asked him for a written statement.

13

- David Gourneau followed up with his superiors, who made the decision that a letter of reprimand should be given to Davis, which was issued on January 3, 2005, the first day of school following the Christmas recess.

- Champagne acknowledges that she and Davis have had almost no interaction since the letter of reprimand was issued.

- When Champagne complained about still feeling uncomfortable given the proximity of her and Davis's classrooms and the open entryway between them, a door was promptly installed.

- By the end of February 2004, Davis was out on medical leave for the remainder of the 2004-2005 school year and when he returned in the fall, whether fortuitous or not, he was given another teaching assignment in a different place in the building remote from Champagne's classroom.

Based on the foregoing, the court concludes that the BIE took prompt and effective action within the meaning of the law, at least as of December 17, 2004.

Champagne argues, however, that the BIE knew, or should have known, about Davis's other objectionable conduct earlier. But, construing the evidence most favorably for Champagne, the earliest date the BIE arguably should have known is when Champagne claims she verbally reported it to Patty Gourneau. According to Champagne, this occurred sometime after Thanksgiving, in late November or early December 2004. At that time, Champagne's expressed concern was merely that Davis be talked to; there was no expression of urgency; and there was no report of any physically threatening conduct. Also, from the Defendant's perspective, the context cannot be ignored. This

14

was a situation involving two co-workers, both with good employment records, who had worked closely together for many years without apparent problems

Under these circumstances, the BIE would have been permitted a reasonable amount of time to conduct an investigation. See, e.g., Tatum v. Arkansas Dep't of Health, 411 F.3d 955, 959 (8th Cir. 2005)(investigation began 14 days after report); Stuart v. General Motors Corp., 217 F.3d 621, 633 (8th Cir. 2000)(investigation began nine days after report). And, given the nature of what was then being claimed, the fact that no action had been taken by December 17, 2004, was not unreasonable. Then, the incident with panties occurred on December 17, and prompt action was taken, beginning that same day.

Given the foregoing, the court concludes there is insufficient proof as a matter of law that the BIE failed to take prompt and effective remedial action after it knew or should have known of the objectionable conduct.

## III.   CONCLUSION

Based on the foregoing, the Court concludes Champagne has failed to establish elements four and five of her *prima facie* case as a matter of law. Hence, the Government's motion for summary judgment is **GRANTED,** and the clerk is instructed to enter judgment dismissing plaintiff's complaint with prejudice. However, the court will not award costs to the defendant given the fact that plaintiff's complaints were not frivolous, the remedial purposes served by Title VII, and the fact that Davis's conduct was clearly objectionable.

**IT IS SO ORDERED**.

Dated this 14th day of May, 2007.

15

/s/ Charles S. Miller, Jr.
Charles S. Miller, Jr.
United States Magistrate Judge